UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DAVID SNELL GABRIEL                          CIVIL ACTION

VERSUS                                       NUMBER: 10-4508

MICHAEL J. ASTRUE,                           SECTION: "R"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based upon disability. (Rec. docs. 15, 18).

Daniel Snell Gabriel, plaintiff herein, filed the subject applications for DIB and SSI benefits on November 2, 2007, with a protective filing date of October 29, 2007, alleging disability as of September 27, 2007. (Tr. pp. 96-103, 92-95, 107). In a Disability Report that appears in the record, the conditions

resulting in plaintiff's inability to work were identified as arthritis, left brachial plexus, and chronic pain syndrome. (Tr. p. 112). Those conditions first began interfering with plaintiff's ability to work in the early 1980's and he ultimately stopped working on September 27, 2007 after being laid off. (<u>Id</u>.). Plaintiff's applications for Social Security benefits were denied at the initial level of the Commissioner's administrative review process on March 31, 2008. (Tr. pp. 51-54). Pursuant to plaintiff's request, a hearing <u>de</u> <u>novo</u> before an Administrative Law Judge ("ALJ") went forward on March 18, 2009 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 57-58, 27-47). On June 17, 2009, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 14-26). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-5). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In his cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

I. [t]his Court should grant summary judgment in favor of

the plaintiff because the ALJ applied improper legal standards in evaluating the medical opinion evidence and the ALJ's opinion evidence findings are unsupported by substantial evidence.

II. [t]his Court should grant summary judgment in favor of the plaintiff because the ALJ misstated the opinion of a state agency consultant and then afforded it weight in his decision.

III. [t]his Court should grant summary judgment in favor of the plaintiff because the ALJ erred in evaluating the credibility of the plaintiff's statements in that he mischaracterized the plaintiff's testimony, as well as the medical evidence of record.

(Rec. doc. 15-2, p. 10).

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

1. [t]he claimant meets the insured status requirements of the Social Security Act through March 31, 2009.

2. [t]he claimant has not engaged in substantial gainful activity since September 27, 2007, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. [t]he claimant has the following impairments: Thoracic Outlet Syndrome; Arthritis; Anxiety; and Alcohol Abuse (20 CFR 404.1520(c) and 416.920(c)).

4. [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5. [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(b) and 416.967(a) except he would be restricted to unskilled work with the opportunity to alternate between sitting and standing at least once per

hour and he would not engage in any repetitive work that required his arms to be above the shoulder level.

6. [t]he claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. [t]he claimant was born on March 7, 1960 and was 47 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8. [t]he claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. [t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. [t]he claimant has not been under a disability, as defined in the Social Security Act, from September 27, 2007 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. pp. 19, 20, 24, 25, 26).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292

4

(5th Cir. 1992); <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1021 (5th Cir. 1990); <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C §405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 91 St.Ct. 1420 (1970). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Jones v. Heckler</u>, 702 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. <u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that he is disabled with the meaning of the Social Security Act. <u>Harrell v. Bowen</u>. 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C §§423(d)(1)(A) and 1382c(a)(3)(A). Once the claimant carries his initial burden, the Commissioner then bears

the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. Harrell, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

    1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

    2. an individual who does not have a "severe impairment" will not be found to be disabled.

    3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

    4. if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.

    5. if an individual's impairment preclude him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 St.Ct. 2287, 2294 n.5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony

or other similar evidence to establish that such jobs exist. <u>Fraga</u>, 810 F.2d at 1304 (citing <u>Lawler v. Heckler</u>, 761 F.2d 195, 198 (5th Cir. 1985)). Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. <u>Mays v. Bowen</u>, 837 F.2d 1362, 1364 (5th Cir. 1988); <u>Fraga</u>, 810 F.2d at 1302.

At the outset of the administrative hearing that was held on March 18, 2009, plaintiff's counsel asked that the matter be held open to allow him to supplement the record with the most recent report from Dr. Ducombs and the remaining exhibits were admitted into evidence. Counsel then made an opening statement, arguing that plaintiff suffered from thoracic outlet syndrome in his younger years but was able to work subsequent to that until he became afflicted with severe arthritis in the shoulders two years earlier. Dr. Ducombs had reportedly declared plaintiff disabled based upon those two conditions. And despite a past history of substance abuse, counsel emphasized that plaintiff had not used drugs in many years and had stopped excessive drinking one year earlier. (Tr. pp. 29-31).

Plaintiff then took the stand and was questioned by the ALJ. He was forty-nine years of age at the time, stood at 5'11", and weighed 185 pounds, having gained 40 pounds in the previous six months due to medication side-effects. Plaintiff had a high school

education and had worked until September 27, 2007 as the lead carpenter of a construction company, a job he had held for two and a half years. Prior to that, plaintiff performed the same work on a self-employed basis and, before that, for other construction companies. Plaintiff testified that he suffered from arthritis to the knees, more so on the right, and to the shoulders, elbows, and hands and had thoracic outlet syndrome in both shoulders. Rising up from a kneeling position elicited pain, walking was limited secondary to pain, and use of the arms above shoulder level was most problematic.

Due to numbness and pain in the arms, plaintiff conducted his daily activities in fifteen to twenty-minute increments of time. An average day for plaintiff consisted of rising, taking his medications, and then doing household chores such as laundry as tolerated. Plaintiff walked to retain his flexibility but was required to rest after four hundred yards. He was able to grocery shop, visit others, and cut the grass with a riding lawnmower. For enjoyment, plaintiff relied upon television and radio but he was no longer able to hunt, fish, or engage in other activities as he used to. Sleep was interrupted as a result of pain and numbness. Plaintiff could drive only short distances because of medication side-effects and pain to his knees, shoulders, and hands. Plaintiff testified that at one time he used to drink alcohol to

mask his pain but that was no longer necessary since he was on a more effective medication regimen.  He saw Dr. Ducombs on an "as needed" basis and every six months for medication refills which included Xanax, Celebrex, Cymbalta, Lyrica, Albuterol, and Spiriva. Plaintiff acknowledged that these medications helped but he still had pain a daily basis.  He estimated that he could stand for forty-five minutes or less, sit for one hour, and lift five to ten pounds on a regular basis.  While he was capable of lifting an object weighing forty to sixty pounds, that would put him out of commission for the remainder of the day.  Plaintiff generally got along with others and had minimal concentration problems. (Tr. pp. 31-39).

Upon being tendered to his attorney for further questioning, plaintiff testified to suffering from daily pain through the arms, particularly the shoulders, accompanied by a burning/tingling/numbness sensation and pain to the inner part of the right knee which varied depending on the level of activity or if rising from a kneeling position. Plaintiff's medications caused fatigue such that he had to rest all day at times or was inactive until the early afternoon on others.  If he did not spend the whole day in bed, plaintiff testified that he had to lie down two to three hours every day.  The variable nature of his pain made plaintiff unreliable and, consequently, unable to work. (Tr. pp.

39-41).

John Yent, a VE, was next to take the stand. He first classified plaintiff's past job as a carpenter as heavy, skilled work and his job as a general construction worker as heavy, semi-skilled work. The ALJ then posed a hypothetical question to the VE which assumed an individual of plaintiff's age, education, and work experience who was limited to sedentary, unskilled work that provided the opportunity to alternate sitting and standing once per hour and with no repetitive work above the shoulder level. In answer thereto, the VE testified that the individual described in the hypothetical question could not perform plaintiff's past work. However, the individual could perform a reduced percentage of the sedentary, unskilled positions of information clerk, survey taker, or laborer/material-mover-by-hand, with significant numbers of such jobs existing in the national and local economies. The ALJ then posed a second hypothetical question to the VE which contained the same profile as the first one but the individual missed work three days per month on an irregular basis. With that added limitation in mind, the VE testified that the jobs he had identified could not be performed. (Tr. pp. 41-45).

Under further questioning by plaintiff's attorney, the VE was asked to assume the same profile as the ALJ's first hypothetical question but the individual suffered from severe pain that

frequently interfered with his ability to concentrate. Faced with that question, the VE testified that the described individual would be unable to maintain employment. The result would be the same if the individual had to lie down two to three hours per day at unscheduled times. (Tr. pp. 45-47).

The documentary evidence that was generated during the relevant time period[1]/ begins with medical records from Dr. Charles Ducombs who saw plaintiff on October 18, 2007 for complaints of nerve problems and pain. On that date, plaintiff presented with increasing pain in his hands, neck, and left upper extremity where he had a left brachial plexus injury. Plaintiff reported getting the shakes a little more often and he admitted to drinking approximately eight beers per day which tended to calm him down.

---

[1]/ Social Security Regulations require an ALJ to develop the medical history of an individual seeking DIB and/or SSI benefits for the twelve-month period prior to the month in which the application for benefits was filed unless there is reason to believe that development of an earlier time period is necessary or unless the individual claims that his disability began less than twelve months before the application for benefits was filed. 20 C.F.R. §§404.1512(d), 416.912(d). In the latter situation, the individual's medical history is to be developed beginning with the month that the disability allegedly began unless there is reason to believe that the disability began earlier. 20 C.F.R. §§404.1512(d)(2), 416.912(d)(2). Here, plaintiff protectively filed his applications for benefits on October 29, 2007 and alleged disability as of September 27, 2007, a period of less than twelve months earlier. As plaintiff makes no suggestion that his disability began prior to the latter date, the relevant time period thus begins in September of 2007.

Bloodwork was essentially normal. The dosage of plaintiff's Cymbalta had been adjusted to a more effective level and the dosage of Celebrex was to be increased. Dr. Ducombs opined that plaintiff's condition was likely due to chronic wear and tear as opposed to an autoimmune type of arthritis. Upon physical examination, plaintiff's neck was normal other than some minimal paraspinal spasm in the left upper extremity and with a full range of motion. Plaintiff had normal grip strength and 4/5 strength throughout and his hands showed some osteoarthritic changes and Heberden's and Bouchard's nodes. The assessment was arthritis, not otherwise specified, and anxiety/depression. Plaintiff was to follow up with the doctor as needed. (Tr. pp. 167-168, 230-231). On that same date, Dr. Ducombs authored a "TO WHOM IT MAY CONCERN" prescription pad note in which he stated that plaintiff was "... unable to work in his current occupation ..." due to significant arthritis, left brachial plexus injury, and chronic pain syndrome. (Tr. p. 154).

On November 30, 2007, plaintiff completed the Administration's form denominated "Function Report-Adult" which elicited information about how his conditions limited his activities. In describing an average day, plaintiff indicated that the pain and numbness to his arms and knees varied from day-to-day and essentially dictated the activities that he was able to perform on any given day.

Generally, plaintiff would rise, take his morning medications, tend to his dog, take a short walk to loosen up, and then do a variety of paperwork and perhaps go to the Post Office.  After taking his mid-day medications, plaintiff would perform minor indoor and outdoor household chores in increments with rest periods in between.  Plaintiff would use a hot tub for mild exercise and therapy, watch TV, cook or pick up food, visit with family and friends, take his evening medications, and then retire.  On some days, plaintiff spent the bulk of his time resting.

Continuing, plaintiff indicated that he required no help with his personal needs and cooked his own meals although heavy pots and pans were awkward to handle.  Plaintiff was capable of performing a wide range of household chores and yardwork but needed frequent breaks to accomplish those tasks.  He could drive and shop as needed but many of the hobbies he once had could no longer be enjoyed.  Plaintiff followed spoken instructions well, got along with authority figures, and handled changes in routine fairly well but was increasingly stressed, bored, and aggravated about his loss of abilities. (Tr. pp. 119-130).

On January 22, 2008, plaintiff underwent a consultative psychological evaluation by Dr. Sandra Durdin.  Presenting problems were identified as arthritis, left brachial plexus, chronic pain syndrome, anxiety, and depression.  Plaintiff advised Dr. Durdin

that he had unsuccessfully applied for Social Security benefits years earlier when he had shoulder surgery, resulting in him having to return to work until his condition subsequently worsened. In connection with her evaluation, the doctor had reviewed medical records from Dr. Ducombs which documented plaintiff's consumption of six to twelve beers per day and complaints of pain, anxiety, and depression. Plaintiff reported a fifteen to twenty-year history of custom woodworking, remodeling, and renovation until September 27, 2007 when his shoulders became more painful and his supervisor expressed concern over the medications he was taking.

Plaintiff advised Dr. Durdin that he suffered from COPD, arthritis, and "nerves" with his left shoulder being worse than the right and with occasional tingling in the fingertips. As a result of those difficulties, plaintiff could no longer do the carpentry work he once had and he suffered from depression secondary to pain. Plaintiff had reportedly decreased his beer consumption but he still smoked a pack of cigarettes per day. Medications at the time included Spiriva, Albuterol, Cymbalta, Xanax, Celebrex, Tagamet, and Alprazolam. Dr. Durdin found plaintiff to have a normal affect and mood and adequate memory and overall cognitive skills with his estimated level of intellectual functioning possibly being above average. Thought content and organization were logical and goal-directed. The DSM IV diagnoses were as follows: Axis I - pain

disorder, not otherwise specified, adjustment reaction with depressed and anxious mood, alcohol abuse/dependence, and rule out Benzodiazepine dependence; Axis II - none; and, Axis III - deferred. In her concluding remarks, Dr. Durdin noted that plaintiff's ability to understand, remember, and carry out simple instructions and familiar detailed instructions was good as was his ability to maintain attention to perform simple repetitive tasks for two-hour blocks of time. From a mental perspective, plaintiff's ability to sustain effort and persist at a normal pace over the course of a forty-hour work week was considered adequate. His ability to relate to others, including supervisors and co-workers, was good as was his ability to tolerate the stress and pressure associated with day-to-day work activity and demands. Plaintiff was capable of managing his own financial affairs but the doctor questioned the effects of plaintiff's alcohol abuse and Benzodiazepine use. (Tr. pp. 174-178).

On February 12, 2008, an Administration psychological consultant reviewed plaintiff's file and set forth his findings in a "Psychiatric Review Technique" form. There, the consultant checked off the appropriate boxes on the form to indicate that plaintiff's condition had been measured against the criteria of Sections 12.04, 12.06, and 12.09 of the Listing of Impairments but that plaintiff did not suffer from a severe mental impairment.

However, he did suffer from an adjustment reaction with a depressed and anxious mood as well as alcohol abuse/dependence, rule out Benzodiazepine dependence, conditions that imposed no functional limitations. It was felt that plaintiff's complaints regarding his limitations were physical ones. (Tr. pp. 181-194).

On March 11, 2008, plaintiff underwent a consultative neurological evaluation at the hands of Dr. Daniel Trahant. Plaintiff informed the doctor that he suffered from bilateral thoracic outlet syndrome for which he had undergone a decompression of the left brachial plexus in 1992. Following that surgery, plaintiff continued to have pain in his arms although the use of the left arm was dramatically improved. Plaintiff also related that he had been diagnosed with bursitis in the shoulders, often waking up with a heavy feeling in the arms and pain to the forearms and upper arms which at times occurred independently. He described an aching of the neck and a sensation that his arms and hands were in a tremor. The only symptom affecting the lower extremities was arthritis pain in the knees. Upon physical examination, plaintiff had a full range of motion of the neck without cervical muscle spasm or tenderness. Thoracic outlet maneuvers were negative on the left but were positive on the right at 100 degrees of abduction with a loss of pulse and numbness in the right upper extremity. Neurologically, all cranial nerves were intact and

plaintiff had normal muscle tone, strength, and bulk throughout. Gait was normal and tandem walking was done well. Dr. Trahant opined that plaintiff suffered from bilateral thoracic outlet syndrome which had been minimized on the left but still resulted in pulse decreases on abduction of the right shoulder. Otherwise, plaintiff was neurologically intact with no cervical radiculopathy, myelopathy, or other neuropathic process. (Tr. pp. 179-180).

On March 27, 2008, an Administration physician reviewed plaintiff's file and set forth his opinions regarding plaintiff's capabilities in a "Physical Residual Functional Capacity Assessment" form. There, the doctor indicated that plaintiff could occasionally lift and/or carry twenty pounds and could frequently lift and/or carry ten pounds; that he could sit, stand, and/or walk for six hours per eight-hour workday; that he had an unlimited ability to push and/or pull; that he could never work on a ladder/rope/scaffolds but could occasionally engage in the remaining postural maneuvers; that he was limited in reaching, including overhead; and, that he had no visual, communicative, or environmental limitations. In the latter portions of the form the medical consultant noted that plaintiff was capable of performing all activities of daily living. (Tr. pp. 195-202).

Plaintiff returned to Dr. Ducombs on April 15, 2008 to obtain refill samples of Cymbalta and Celebrex and for a refill of Xanax.

Plaintiff had not worked in approximately six months due to chronic pain in the knees, hands, wrist, and shoulders and chronic weakness of the arms, the left worse than the right. The doctor was to complete certain disability-related paperwork and he remarked that given plaintiff's most recent occupation, it was unlikely that he would be able to perform that work on a consistent basis as he had trouble raising his arms over his head. Dr. Ducombs speculated that a component of fibromyalgia may be present. Plaintiff questioned the continuing effectiveness of Cymbalta and the use of Lyrica was contemplated. For his part, Dr. Ducombs pondered whether plaintiff should be seeing an orthopedic surgeon, a neurovascular surgeon, or a neurologist given his overall situation and lack of insurance. Plaintiff also had chronic shaking of the hands and the doctor noted that he continued to consume alcohol nearly every day.

Upon physical examination, plaintiff's pain level was said to be "0" on a scale of 1 to 10. He had normal grip strength bilaterally but proximal muscle weakness at the shoulders with 3-4/5 strength of the left upper extremity, 4-5/5 on the right, and minimal crepitus of the knees bilaterally. The assessment was arthritis, likely osteoarthritis; chronic pain syndrome; a fine resting tremor; and, anxiety and depression. Plaintiff was started on Lyrica and was given a refill on his Cymbalta. Further

evaluation by a subspecialist was strongly recommended. (Tr. pp. 208-210, 227-229). On the same date as the evaluation Dr. Ducombs completed a "Certificate of Attending Physician" for plaintiff's insurer. In that form, the doctor identified plaintiff's disability, one that was reported to be total and lasting an indefinite period of time, as a marked decrease in strength due to bilateral thoracic outlet syndrome. Also noted on the Certificate were fibromyalgia and osteoarthritis of the hands and knees. (Tr. p. 255).

Plaintiff was seen again by Dr. Ducombs on August 5, 2008 for the purpose of obtaining a referral to a neurosurgeon. Plaintiff advised the doctor that he could no longer work as his carpenter work required the use of his hands. Because Dr. Ducombs could offer plaintiff no further relief from his symptoms, he gave him the names of several neurosurgeons in the Baton Rouge area who may be able to help. Plaintiff's symptoms had not changed and he still suffered from weakness to the upper extremities and tenderness over the trapezius, elbows, knees, and wrists. Lyrica and Celebrex did provide plaintiff relief. Plaintiff still had some occasional shaking and its connection to his alcohol consumption remained unclear. He had normal grip strength and strength was 3/5 for the left upper extremity and 4/5 for the right. There was a full range of motion of the neck joint. The assessment was a history of

thoracic outlet syndrome, fibromyalgia, and arthritis, not otherwise specified. Plaintiff was continued on his current medication regimen. (Tr. pp. 218-219, 225-226).

On January 30, 2009, plaintiff returned to Dr. Ducombs for his six-month checkup. Complaints of chronic neck and arm pain due to thoracic outlet syndrome continued. Plaintiff also had arthritis in the knees, wrists, and hips for which he took Celebrex and Lyrica which admittedly helped. Plaintiff additionally took Xanax for anxiety and had reportedly reduced his alcohol consumption to one to two drinks per day but he continued to smoke. Upon physical examination, plaintiff had a supple, full range of motion to the neck with no real stiffness but he did have some upper trapezius spasms and tender points bilaterally to the trapezius muscles. In the upper extremities, strength was 3/5 on the left and 4/5 on the right. Neurologically, deep tendon reflexes were slightly diminished on the upper extremities but were normal for the lower extremities. The assessment was thoracic outlet syndrome with chronic pain, tobacco abuse, alcohol abuse, and depression. Plaintiff was continued on Celebrex, Lyrica, Cymbalta, and Xanax and was to follow-up with a spine specialist. (Tr. pp. 216-217, 223-224).

Plaintiff was next seen again by Dr. Ducombs on July 24, 2009

for the purpose of obtaining medication refills.[2]/ Complaints were essentially unchanged with chronic bilateral upper extremity pain and weakness, numbness, and tingling. While Celebrex did provide plaintiff with some relief, he felt that his condition was gradually worsening. Plaintiff was down to one pack of cigarettes per day and he continued to consume alcohol. His anxiety was controlled with Cymbalta and Xanax which also helped his COPD as well. Plaintiff's neck was supple with a full range of motion. He had good pulses to the upper extremities, 4-5/5 strength to the upper extremities, normal deep tendon reflexes and muscle tone, and a normal shoulder shrug. The assessment was thoracic outlet syndrome, no worse on physical examination despite plaintiff's subjective complaints to the contrary; anxiety; tobacco abuse; and, COPD. Plaintiff was continued on Celebrex, Lyrica, Cymbalta, and Xanax. A referral to a specialist was offered but funding was problematic. (Tr. pp. 243-245).

Plaintiff returned to Dr. Ducombs approximately six months later on January 19, 2010 to obtain a refill on his Xanax. He had reportedly stopped drinking and was working on quitting smoking but his blood pressure was elevated. Plaintiff's pain, weakness,

---

[2]/ By this time, the administrative hearing had been held on March 18, 2009 and the ALJ had issued his written decision on June 17, 2009. (Tr. pp. 27-47, 14-26).

numbness, and tingling remained unchanged but there were no headaches, chest pain, or shortness of breath. Upon physical examination, there was no tenderness, fairly normal grip strength, 4/5 strength bilaterally, and a relatively normal range of motion of the upper extremities. Plaintiff did have diminished deep tendon reflexes at the biceps but shoulder shrug was normal. The impression was thoracic outlet syndrome; hypertension; depression and anxiety, stable with Cymbalta use; and, tobacco abuse. Plaintiff was to continue with his prescribed medications and was started on Ramipril and was to return in four weeks. (Tr. pp. 261-263).

The next medical records document plaintiff's return to Dr. Ducombs on February 24, 2010 for follow-up of his hypertension which was much improved after going on prescription medication. Plaintiff was a bit more stiff on that date but had exhausted his supply of Lyrica. The impression was hypertension, much improved with medication. Emphasis was placed on tobacco, alcohol, and salt reduction. Chronic pain/thoracic outlet syndrome were again diagnosed. Plaintiff was offered Neurontin until he could get his Lyrica prescription refilled but he deferred. (Tr. pp. 264-266).

The next treatment note that appears in the record documents plaintiff's return to Dr. Ducombs on July 8, 2010 for a check-up and medication refill. Plaintiff had not been able to obtain

authorization from his insurer to pay for Lyrica so he was willing to try Neurontin. Pain in the left upper extremity and neck was worse and he had lost twenty pounds in the previous six months "due to diet." Plaintiff had bloodwork done in February which was within normal limits. A colonoscopy and chest x-ray were contemplated but were put off based on financial constraints. Upon physical examination of the musculoskeletal system, plaintiff had a normal range of motion and normal strength. The impression was hypertension, stable on medication; chronic thoracic outlet syndrome with neuropathy; and, weight loss that was to be monitored. (Tr. pp. 267-269).

Finally, on July 15, 2010, over a year after the ALJ had issued his written decision, Dr. Ducombs completed a "Physician's Statement of Continuous Total Disability" form in which he checked off the appropriate boxes to indicate that plaintiff was unable to perform his usual occupation or any other occupation as a result of chronic thoracic outlet syndrome with neuropathy causing neck and upper extremity pain. (Tr. p. 260).

As noted above, plaintiff challenges the Commissioner's decision to deny Social Security benefits on three grounds. In the first of those, plaintiff alleges that the ALJ failed to evaluate the medical opinion evidence in accordance with 20 C.F.R.

§416.927(d).[3]/ Plaintiff argues, somewhat inconsistently, that the ALJ accorded no weight to the opinions of his treating physician, Dr. Ducombs, and provided no explanation of the weight he was assigning to the doctor's opinions. (Rec. doc. 15-2, p. 11).

The law is clear that the ALJ has the sole responsibility for determining a claimant's disability status and is free to reject the opinion of <u>any</u> physician when the evidence supports a contrary conclusion. <u>Newton v. Apfel</u>, 209 F.3d 448, 455 (5th Cir. 2000)(quoting <u>Paul v. Shalala</u>, 29 F.3d 208, 211 (5th Cir. 1994), <u>overruled in part on other grounds by Sims v. Apfel</u>, 530 U.S. 103, 120 S.Ct. 2080 (2000)). A treating physician's opinions are not conclusive and may be assigned little or no weight when good cause is shown. <u>Newton</u>, 209 F.3d at 456 (citing <u>Brown v. Apfel</u>, 192 F.3d

---

[3]/ Under Title 20 C.F.R. §404.1527(d), the counterpart to §416.927(d) in the context of Disability Insurance Benefits, an ALJ is to consider the following factors before declining to give a treating physician's opinions controlling weight:

1)  the physician's length of treatment of the claimant;
2)  the physician's frequency of examination;
3)  the nature and the extent of the treatment relationship;
4)  the support of the physician's opinion afforded by the medical evidence of record;
5)  the consistency of the opinion with the record as a whole; and,
6)  the specialization of the treating physician.

See <u>Newton v. Apfel</u>, 209 F.3d 448, 456 (5th Cir. 2000).

492, 500 (5th Cir. 1999) and <u>Greenspan v. Shalala</u>, 38 F.3d 232, 237 (5th Cir. 1994), <u>cert</u>. <u>denied</u>, 514 U.S. 1120, 115 S.Ct. 1984 (1995)). Good cause exists when the treating physician's opinions are so brief and conclusory that they lack persuasive weight, when they are not supported by medically acceptable techniques, or when the evidence supports a different conclusion. <u>Newton</u>, 209 F.3d at 456; <u>Bradley v. Bowen</u>, 809 F.2d 1054, 1057 (5th Cir. 1987); <u>Scott v. Heckler</u>, 770 F.2d 482, 485 (5th Cir. 1985). The Regulations require the ALJ to perform a detailed analysis of a treating physician's views under the criteria set forth in 20 C.F.R. §§404.1527(d) and 416.927(d) <u>only</u> in the absence of controverting medical evidence from other treating and/or examining physicians. <u>Newton</u>, 209 F.3d at 453.

In his written decision of June 17, 2009, the ALJ found that plaintiff suffered from severe impairments in the form of thoracic outlet syndrome, arthritis, anxiety, and alcohol abuse but that said impairments did not satisfy the criteria of any of those set forth in the Listing of Impairments. (Tr. pp. 19-20). Having done so, the Regulations mandated that the ALJ make an assessment of plaintiff's residual functional capacity ("RFC") which is defined as what a claimant can still do in spite of his limitations. 20 C.F.R. §§404.1520(c), 404.1545, 416.920(e), 419.945. In that regard, the ALJ found that plaintiff had the residual functional

capacity to perform a limited range of unskilled, sedentary work which provided an opportunity to alternate between sitting and standing at least once per hour and which did not require the use of his arms above shoulder level on a repetitive basis. (Tr. p. 20). The ALJ then proceeded to discuss the evidence supporting his RFC assessment, properly recalling his obligation to consider "... opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p." (Tr. p. 21).

Among the medical evidence that was considered by the ALJ were Dr. Ducombs' treatment records from April of 2007 through January of 2009, the latter month being the last time plaintiff would be seen by the doctor before the administrative hearing and the issuance of the ALJ's decision. (Tr. p. 22). At that time, plaintiff advised Dr. Ducombs that the prescribed Celebrex and Lyrica were still helping his condition and a physical examination of the neck revealed a supple, full range of motion with no real stiffness. Although plaintiff did have some upper trapezius spasms and tender points bilaterally to the trapezius muscles, strength was 3/5 in the left upper extremity and 4/5 on the right. Deep tendon reflexes were slightly diminished in the upper extremities but were normal for the lower extremities. While these findings may suggest that plaintiff could not meet the rigors of heavy or

even medium-level work, they are not preclusive of all work activity altogether. The ALJ even cited, without criticism and with apparent approval, Dr. Ducombs' opinion of October 18, 2007 that plaintiff was unable to return to his job as a carpenter, work that the VE would subsequently testify was of a heavy exertional level. Dr. Ducombs would repeat this opinion again on April 15, 2008. The medical records that were generated by Dr. Ducombs subsequent to the issuance of the ALJ's decision contain similar findings and on July 24, 2009, the doctor even noted that plaintiff's subjective complaints were not supported by the objective evidence. When examined by Dr. Ducombs on January 19, 2010, plaintiff had no tenderness, fairly normal grip strength, 4/5 strength bilaterally, and a relatively normal range of motion of the upper extremities. On July 8, 2010, plaintiff had a normal range of motion and strength throughout the musculoskeletal system.

Although plaintiff variously argues that the ALJ afforded no weight to Dr. Ducombs' opinions or at least failed to explain the weight that he was giving those opinions, the ALJ, in reality, actually credited the doctor's opinions to a significant degree as they foreclosed the ability to perform heavy work like plaintiff had done in the past but were well within the parameters of the RFC assessment the ALJ would ultimately arrive at. This conclusion is bolstered by the fact that the ALJ had little hesitation in

specifically according little weight to the opinions of the Administration's psychological and medical consultants. (Tr. p. 24). Had he wished to do so with respect to the opinions of Dr. Ducombs, it is reasonable to assume that the ALJ would have so stated. The ALJ, the Court believes, properly evaluated Dr. Ducombs' opinions and gave them the weight that they deserved. This claim is rejected.

In plaintiff's second challenge to the Commissioner's decision, he argues that the ALJ misstated the opinions of the Administration's psychological consultant and then gave those opinions more weight than those of Dr. Ducombs.

Following her consultative evaluation on January 22, 2008, Dr. Durdin found that plaintiff suffered from no psychological impairments that were contraindicative of work activities. The Administration's psychological consultant similarly opined, after reviewing Dr. Durdin's report and other evidence of record, that plaintiff's complaints regarding his limitations were physical ones. In completing the Psychiatric Review Technique form, the consultant found that plaintiff had no restrictions in the activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace, and had experienced no episodes of decompensation, each of extended duration. (Tr. p. 191). From a

strictly mental/psychological perspective, plaintiff's condition was felt to be non-severe. (Tr. p. 193).

In his written decision of June 17, 2009, the ALJ was admittedly incorrect in reciting some of the psychological consultant's findings, stating that the consultant had found that plaintiff had mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. p. 23). However, in light of the consultant's other findings and opinions, the ALJ ultimately concluded that plaintiff had no marked limitations in any of the four domains. (Tr. p. 24). Accordingly, the ALJ gave his admittedly incorrect recitation of the consultant's findings little weight, concluding that plaintiff's anxiety imposed no more than mild restrictions in the activities of daily living or in social functioning. (Id.). Thus, at the end of the day, the ALJ's ultimate conclusions were consistent with the opinions that had been given by the psychological consultant and by Dr. Durdin, i.e., that plaintiff did not suffer from a severe mental impairment that imposed anything more than a slight limitation on his ability to work. Dr. Ducombs being an internist rather than a psychiatrist or psychologist, he was not best qualified to opine on any work-related mental limitations. That having been said, the ALJ was not reluctant to assign little weight to various doctors' opinions as

29

the circumstances warranted. (Tr. p. 24).  The ALJ made no such statement with respect to the opinions of Dr. Ducombs, absent which the Court is unable to conclude, as does plaintiff, that the ALJ gave those opinions less weight than the consultant's opinions or gave them no weight whatsoever.  This challenge lacks merit.

Plaintiff's third and final challenge to the Commissioner's decision is that the ALJ erred in evaluating plaintiff's credibility, mischaracterizing his hearing testimony as well as the medical evidence of record.  Essentially, plaintiff alleges that the ALJ gave insufficient weight to plaintiff's subjective complaints, including pain.

The law is clear than an ALJ must consider a claimant's subjective complaints of pain and other limitations.  <u>Scharlow v. Schweiker</u>, 655 F.2d 645, 648 (5th Cir. 1981).  However, it is within the ALJ's discretion to determine their debilitating nature.  <u>Jones v. Bowen</u>, 829 F.2d 524, 527 (5th Cir. 1987).  Pain is considered disabling within the meaning of the Social Security Act only when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment."  <u>Hames v. Heckler</u>, 707 F.2d 162, 166 (5th Cir. 1983).  The burden is upon the plaintiff to produce objective medical evidence of a condition that could reasonably be expected to produce the level of pain or other symptoms complained of.  <u>Selders v. Sullivan</u>, 914 F.2d 614, 618 (5th Cir. 1990); <u>Harper v.</u>

_Sullivan_, 887 F.2d 92, 96 (5th Cir. 1989). The ALJ must then weigh the plaintiff's subjective testimony against the objective medical evidence that has been produced. _Chaparro v. Bowen_, 815 F.2d 1008, 1010 (5th Cir. 1987) (citing _Jones_, 702 F.2d at 621 n.4). The ALJ may discredit a plaintiff's subjective complaints of pain and attendant physical limitations if he carefully weighs the objective evidence and articulates his reasons for doing so. _Anderson v. Sullivan_, 887 F.2d 630, 633 (5th Cir. 1989)(citing _Abshire v. Bowen_, 848 F.2d 638, 642 (5th Cir. 1988)). It must be remembered that the evaluation of a plaintiff's subjective complaints is a task particularly within the province of ALJ for it was the ALJ who had an opportunity to observe the plaintiff, not the Court. _Harrell_, 862 F.2d at 480. Furthermore, the mere existence of pain or the fact that an individual is unable to work without experiencing pain is not an automatic ground for obtaining disability benefits. _Owens v. Heckler_, 770 F.2d 1276, 1281 (5th Cir. 1985)(citing _Jones_, 702 F.2d at 621 n. 4). In the final analysis, the responsibility of weighing the evidence and determining the credibility of witnesses' testimony and doctors' opinions lies with the ALJ in the first instance. _Carrier v. Sullivan_, 944 F.2d 243, 247 (5th Cir. 1991); _Greigo v. Sullivan_, 940 F.2d 942, 945 (5th Cir. 1991); _Wren v. Sullivan_, 925 F.2d 123, 129 (5th Cir. 1991); _Moore v. Sullivan_, 919 F.2d 901, 905 (5th Cir. 1990).

In assessing plaintiff's RFC, the ALJ properly noted his obligation to consider the medical opinion evidence and the symptoms complained of by plaintiff and to determine the extent to which those complaints could reasonably be accepted as consistent with the objective evidence. (Tr. pp. 20-21). Part of that exercise involves making an evaluation of plaintiff's credibility when the functionally limiting effects of his pain and other symptoms are not supported by the objective evidence. (Tr. p. 21). The ALJ then recalled plaintiff's allegations of being totally disabled from work because of the effects of his physical impairments. (Id.). At odds with those allegations, however, were the activities that plaintiff reported that he was capable of both in the Function Report of record and at the administrative hearing. (Id.).[4] The ALJ concluded that plaintiff's subjective complaints were only credible to the extent that they were consistent with the RFC assessment. (Id.). That assessment limited plaintiff to a reduced range of sedentary work which provided an opportunity to alternate sitting and standing, thus crediting plaintiff's hearing testimony that he had difficulty walking and kneeling. The ALJ's

---

[4] Plaintiff's ability to perform such activities is not indicative of someone who is unable to perform any work whatsoever, Leggett v. Chater, 67 F.3d 558, 565 n.12 (5th Cir. 1995), and reports such as the Function Report may properly be considered by the ALJ in determining a claimant's disability status. Vaughn v. Shalala, 58 F.3d 129, 131 (5th Cir. 1995).

RFC assessment also took into account plaintiff's testimony that he was unable to lift more than ten pounds or to work with his arms above shoulder level.

The ALJ then summarized the medical evidence before him in an apparent attempt to demonstrate that plaintiff's subjective complaints simply lacked objective support to the extent alleged. Plaintiff had undergone right brachial plexus exploration and decompression surgery in 1992 which allowed him to continue to work until September 27, 2007 and it was noted in the Disability Report of record that plaintiff had been laid off as opposed to resigning or being terminated based on an inability to perform necessary job duties. See, e.g., Villa, 895 F.2d at 1024. Plaintiff was subsequently treated by Dr. Ducombs who, on October 18, 2007 and again on April 15, 2008, restricted him from returning to his previous heavy work as a carpenter and construction worker. On the latter date, plaintiff's level of pain was said to be "0" on a ten-point scale. When examined by Dr. Trahant on March 11, 2008, plaintiff had a full range of motion in the neck without spasm or tenderness and normal muscle tone, strength, and bulk throughout. The absence of such objective findings indicative of the existence of completely debilitating pain may properly be considered by the ALJ in adjudicating a claimant's disability status. Adams v. Bowen, 833 F.2d 509, 512 (5th Cir. 1987).

33

Plaintiff had normal grip strength when he was seen by Dr. Ducombs on April 15, 2008 and August 5, 2008. Muscle tone was normal on July 24, 2009 and even Dr. Ducombs himself noted that plaintiff's subjective complaints were not supported by the objective findings. On January 19, 2010, a physical examination of plaintiff revealed no tenderness, fairly normal grip strength, 4/5 strength bilaterally, and a normal range of motion to the upper extremities. When plaintiff was next seen by Dr. Ducombs on February 24, 2010 for follow-up of his hypertension care, plaintiff was said to be more stiff but he had exhausted his supply of Lyrica. In the diagnosis that was made on that date, plaintiff's chief problem was said to be his hypertension, which was admittedly improved, with chronic pain/thoracic outlet syndrome being listed second. And on July 8, 2010, Dr. Ducombs' physical examination of plaintiff revealed a normal range of motion and strength throughout the musculoskeletal system. The principal diagnosis on that date was again hypertension.

Subjective testimony and complaints do not take precedence over objective evidence. A fair reading of the ALJ's decision reveals that to be the reason that he gave plaintiff's testimony the weight that he did. That fulfills his duty here. See Augustine v. Barnhart, 2002 WL 927797 at *4 (E.D. La. May 7, 2002).

### RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's

motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this  22nd  day of _____February_____, 2012 .

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE